IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 27, 2016 Session


**MICHAEL A. ROBERTS v. XAVIERA C. FORREST**


**Appeal from the Circuit Court for Montgomery County**
**No. MCCCCVFN141017     Ross H. Hicks, Judge**

_____


**No. M2015-00230-COA-R3-CV – Filed July 29, 2016**
_____


This appeal arises from a change in the primary residential parent for two minor children. Mother and Father divorced in Oklahoma. After Mother and the children moved to Tennessee, Father petitioned to modify the joint custody plan adopted in the Oklahoma divorce proceeding. Father alleged a material change in circumstance based upon Mother's violations of the joint custody plan and Mother's interference with Father's relationship with the children. Following a hearing, the trial court found a material change in circumstance and that naming Father the primary residential parent was in the best interest of the children. While not contesting that a material change in circumstance occurred, on appeal, Mother asserts that a change in primary residential parent was not in the children's best interest. After reviewing the record, we do not find the evidence preponderates against the trial court's best interest findings. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and RICHARD H. DINKINS, J., joined.

H. Reid Poland III (on appeal) and James Phillips (at trial), Clarksville, Tennessee, for the appellant, Xaviera Caraballo Forrest.

Christopher J. Pittman and B. Nathan Hunt, Clarksville, Tennessee, for the appellee, Michael Anthony Roberts.

## OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

Xaviera Caraballo, now Xaviera Forrest, ("Mother") and Michael Roberts ("Father"), both active duty members of the military, divorced in Oklahoma on June 22, 2011. A Joint Custody Plan provided for the care, custody, and control of their three minor children and named Mother the primary custodial parent. In anticipation of moves stemming from their military service, the parenting time or "custodial period" granted to each parent varied depending on the distance that they lived apart following the divorce. If they lived over 200 miles apart, the Joint Custody Plan granted Father the following custodial periods:

> Spring Break: Even numbered years from the night school lets out to the day before school resumes. Exchange times will be worked out between the parties.
> Thanksgiving: Even numbered years from the night before Thanksgiving until Sunday night. Exchange times will be worked out between the parties.
> Christmas: Odd numbered years from Christmas Eve night until the night before school resumes. Exchange times will be worked out between the parties.
> Summer: From one week after school recesses for the summer break until one week before school resumes. Exchange times will be worked out between the parties.

> The above is specified minimum custodial periods. Additional custodial periods as well as liberal telephone communication is to be encouraged.

The Joint Custody Plan also provided that, if Mother was "given military orders to report to an unaccompanied tour of duty, [Father] shall have physical custody of the minor children until the end of said tour of duty."

Difficulties arose soon after the divorce. In mid-December 2011, Mother moved with the children, Mark, Micaiah, and Ava, to Clarksville, Tennessee. After Mother's move, Father claimed he had difficulty communicating with Mother and, as a result, he was unable to visit with the children. Father explained that Mother would not answer the telephone or that she denied requests to schedule visits. According to Father,

> [Mother] was unreachable most of the time. A lot of the times we would talk on the phone. She would question like, Why do you want to talk to them? Why do you care? They're not -- they don't care about you. Why do you care about them? And it's questioning my -- like Why do you care? Why do you

2

want to talk when they don't mean anything to you?  You don't mean anything to them . . . .

During Christmas of 2012, Father wanted to send the children presents.  He called Mother because he had lost her address, and Mother told Father not to send any presents.  Mother also stated she was going to tell the children that any presents were from their "real dad" Adam.  Ultimately, Father did not send any Christmas gifts to his children that year.

In 2013, Mother deployed from approximately February through November.  Although the Joint Custody Plan provided that Father would have the children during deployments, Mother left the children with her mother, the children's grandmother, in North Carolina.  Father stated that Mother never offered to allow him to keep the children during her deployment, but Mother stated Father never asked for the children.  In either event, Father claimed that communications with his children improved while they stayed with their grandmother.

Mother returned from deployment on November 26, 2013.  Father only learned of Mother's return through a Facebook post by their eldest son.  The Joint Custody Plan provided that Father would have the children that year "from Christmas Eve night until the night before school resumes," but Mother and her girlfriend took the children on a Christmas trip to Texas.  By that time, Father lived in Texas and learned that Mother and the children were nearby through Facebook.  However, Father again experienced communication issues and was unable to talk with Mother.

Mother requested that Father communicate with her through her girlfriend, Lauren.  Because he was unable to speak with the children at Christmas, Father contacted Lauren via text message to ask about speaking with the children before the New Year.  Father texted, "Nice to meet you Lauren.  I hope you have a great New Year . . . as well as your Family.  If at all possible I would love to talk to Mark, Ava, and Micaiah before 2014 kicks off.  I don't mean to be a burden.  Thanks again!"  Lauren responded, "I'll talk with [Mother] thank you."  After the New Year, Lauren sent Father the following text:

> Hey guy, I asked nicely for you to leave us alone on our family vacation and you have completely disrespected me and our wishes.  I do not appreciate that and as far as visitation . . . .  The kids do not want to see you.  Sorry, we are planning a DNA test as well as court for custody change to prove your [sic] not even capable of having kids . . . .

A few minutes later, she texted that she had asked one of the children if he wanted to call and that he had replied "no that he forgot about you."  She also added in the apparent rejoinder, "So back off our kids."  Despite their proximity, Father did not see or speak with his children during their trip to Texas.

3

Like her girlfriend, Mother also denied the children's parentage. She acknowledged, while in the car with the children, telling Micaiah and Ava that Father was not their natural father. In January of 2014, Mother took Micaiah to a health clinic due to concerns over his behavior. In providing family medical history, Mother stated that she did not know who Micaiah's father was and that Father had adopted Micaiah at age one. At another health clinic visit, on April 10, 2014, the medial record reflected: "Biological father is unknown. [Micaiah] is the product of paternal sperm donations." Mother also shared her view with Father. Once when Father texted if he could communicate with the children by Skype or Facetime, Mother responded "That's prob because you don't have any."

The Joint Custody Plan granted Father spring break with the children in 2014. Father sent Mother an e-mail with the children's travel itinerary in January of 2014. Later, Mother informed Father that Micaiah could not make the trip due to health issues. Mark and Ava did make the trip to visit Father, but amid the visit, Mother e-mailed Father with a new itinerary showing she had purchased an early return flight for Mark. Mother did not communicate with Father regarding this change.

In April of 2014, Micaiah was admitted to a hospital. Father learned of the admission through a Facebook posting. Father texted Mother, questioning her about the circumstances of the admission and asking for the name of the hospital and to speak with Micaiah. Mother texted back that "Your [sic] not on the access roster to speak or see him so if you call they wont [sic] be able to give you any information." Mother did not reveal the name of the hospital.

In a second set of texts, Father inquired about Micaiah and how long he was expected to be in the hospital. Father also texted, "Any info you can provide would be nice" and "I am worried." Mother responded by text as follows:

> We are heading to breakfast with laurens [sic] mom and dad. I understand your [sic] worried but he is getting the best care they have here. I will tell you what happened when we leave here, but i don't [sic] feel like starting my day with all this today. We will contact you later. Have a good day.

A few hours later, Father texted, "Any info on Micaiah?" Mother replied: "Hello, we are still at parents[;] please do not harass us about this right now. Still need your unit info too. Bye." Three days after first inquiring about Micaiah's hospitalization, Mother provided Father with the name of the hospital and the access number necessary to speak with his son.

On May 23, 2014, Father filed a petition to "domesticate"[1] and modify the Oklahoma

---

[1] Under the Uniform Child Custody Jurisdiction and Enforcement Act, registration of the child-custody

4

Joint Custody Plan in the Circuit Court for Montgomery County, Tennessee. Father requested that the court "determine that there has been a material change in circumstances warranting the Court to enter a new parenting plan designating the Father as the primary residential parent of the parties' two (2) younger children." Father also alleged that it would be in Mark's best interest to reside with Father, but due to the child's age and "strong desire to remain with his Mother," Father did not seek to be named Mark's primary residential parent. Mother filed an answer and counter-petition for modification of the parenting plan and child support. Later, Mother received permanent reassignment orders to Hawaii, and she filed a motion also requesting that the court permit her to relocate to Hawaii with the children.

The court conducted a hearing on Father's petition on December 10, 2014. Father, Mother, a close friend of Mother, and Mother's mother testified. Father testified that his difficulties exercising parenting time continued after the filing of his petition. Only Ava visited him during the summer. According to Father, the oldest child did not want to visit. When asked if their relationship was strained, Father stated "Yes, he didn't want to come. He doesn't want to talk to me. He doesn't want nothing to do with me." Father testified that Mother did not permit Micaiah to visit due to his health.

Father also recounted an incident involving Ava. A few months before the trial, Father planned to visit Ava for her birthday. However, that week, Father injured himself breaking up a "dog fight" and was hospitalized. Father e-mailed Mother the day before Ava's birthday to let her know that he had been in the hospital and could not make it until the following day. Father's e-mail continued:

> I still plan on coming. As soon as I'm able to coherently drive tomorrow I will leave to make it there by Friday. I'm sad that this happened and very disappointed. I was wondering if I could have an extra hour on Friday? It is nice that you are allowing me to see them that day. I'm grateful for that . . . . I wish I had more time . . . .

Mother replied within a few minutes indicating that the family had other plans for that day.

> An email was sent the day before yesterday asking about possible Friday visitation and asking for notice that you would be taking advantage of this visitation. No response was ever given, so now we have plans for Friday and

determination of another state permits enforcement of the determination as if it were a Tennessee child-custody determination; however, registration does not permit modification. Tenn. Code Ann. § 36-6-230 (2014). In this case, the trial court possessed jurisdiction to modify the Oklahoma joint custody plan because it had jurisdiction to make an initial custody determination and the parents and children no longer resided in Oklahoma. *See id.* § 36-6-218 (2014).

this weekend like I said in the last email I just sent.  However, like I said we can discuss an alternate weekend for possible visitation at a later date.  Again, we have plans for this weekend, next weekend, Halloween weekend, and a weekend at the beginning of November. So let me know any ideas for possible visitation on a weekend and I will let you know if we have plans or not.  Again I'm sorry this happened.

Despite Mother's reply, Father traveled to visit with Ava on Friday.  Father briefly spent time with Ava at her school.  Father also contacted Mother to let her know that he was in town and to ask if he could drop-off a present for Ava.  According to Father, Lauren instructed him to leave the present on the street in front of the house, which he did.  Undeterred, Father called Mother's house.  The children answered, but Father testified that he could hear Lauren telling the children to hang up just before they did so.

That same weekend, Father showed up at Micaiah's football game.  Father saw Mother, Lauren, Mark, and Ava sitting in the bleachers, and he "sat down kind of next to them hoping that I could at least give Ava a hug or come see her."  Father testified that, when he sat down, they moved to the other side of the bleachers.

A few months later, Father contacted Mother for permission for the children to come a day early for the Thanksgiving holiday.  Mother declined.  Mother also demanded that Father, who had remarried in October of 2012, produce his marriage certificate as a precondition to the visit.  Although Father produced the requested certificate, only Micaiah and Ava came to visit; Mark did not want to go.

Finally, Father expressed concerned about the children going with Mother to Hawaii. In the words of Father, his relationship with the children would "go downhill and it's going to continue to go downhill.

Mother testified that her communication problems with Father only really developed in 2014.  Prior to that, she described herself as "more flexible with being reached," and according to Mother, Father "would call whenever he wanted and, you know, I would just answer."  Mother explained that the situation had changed.  First, she had married Lauren in April of 2014.  Second, Micaiah was diagnosed with autism, a mild mood disorder, and depression, and although he was high functioning, Micaiah required routine.  In the words of Mother,

And now since I've been back and I'm married and because of everything that [Micaiah's] going through, we have to be on a stricter routine, and I don't think that [Father] completely understands or maybe he just doesn't really think that we're being honest or maybe we're trying to hinder on how rigid we have to maintain the schedule.

Mother denied attempting to impede Father's visitation. Mother explained that she had no problem with Ava visiting, but she did not permit Micaiah to visit earlier in the year over concern that "[h]e would break down." She believed visitation was now possible because she could prepare the child for the change in his routine. She testified that, "through lawyers and also with help of his [applied behavior analysis therapy], we gave [Micaiah] a very basic routine to help with visitation . . . , and we all felt comfortable that he would be able to go on his visits in more basic routine . . . ."

Mother addressed each incident of which Father complained. Mother did not think spending the Christmas of 2013 with the children was an issue given her deployment and that her actions were consistent with the Joint Custody Plan. Mother thought Father's loss of time was offset by his opportunity to exercise more visitation while she was deployed. Mother explained her thinking as follows: "I was gone nine months, I missed everything. I thought that he might have used visitation, but I figured that I've been gone nine months. I got home November 26, and I thought it would be okay to have Christmas with the kids."

As for the text messages, Mother claimed that some of the messages that came from her phone actually came from Lauren. When she discovered the back-and-forth, Mother stated she was upset, and not just because Lauren was using her phone. She also claimed that she had called Father to apologize. In the call, she said she promised "it wouldn't happen."

She admitted purchasing the early return ticket for spring break, but she claimed she did so only because the itinerary she received did not show a return flight. However, Mother was forced to concede on cross-examination that the itinerary did include a return flight. She also acknowledged receiving the itinerary prior to purchasing the early return ticket.

Mother blamed a power outage and snow for not immediately informing Father of the name of the hospital where Micaiah was admitted in April of 2014. Although she stated the hospital did have power, she explained that she was stuck at her home because of the snowfall and then had to return to work. She claimed that, as soon as she was able to get power and as soon as the installation had power, she notified Father "right away." When asked why she did not use her mobile phone to inform Father of the name of the hospital, Mother blamed Lauren. Mother testified that Lauren had her mobile phone and that she was responsible for the texts to Father, but Mother did acknowledge sending the text asking Father not to bother her while she was with Lauren's parents and Micaiah was in the hospital.

Mother also acknowledged most of the incidents in which she denied that Father was the natural father of Micaiah and Ava. Mother testified that she told Micaiah and Ava that Father was not their natural father out of anger. She conceded it was "very wrong" to do so. When asked if she was also angry when she told a medical provider that Micaiah was the product of a parental sperm donation, Mother replied, "Technically, that's kind of what he

7

is." Mother attempted to explain away her text reply to Father in which Father asked about communicating with the children by Skype or Facetime and Mother responded "That's prob because you don't have any." At first, Mother testified that she was mad. Later, Mother explained that she was not denying that Father had children, rather she was informing Father that he did not have Skype or Facetime.

The trial court entered a judgment granting Father's petition to modify the Joint Custody Plan on December 18, 2014. The court found a material change of circumstances "based upon both the pattern and conduct of the Mother that has impacted the Father's ability to maintain a relationship with the children and the Mother's pending move to the State of Hawaii." The court's order also reflected "that this is the most outrageous and egregious case of wrongful conduct of a primary residential parent in terms of deliberately alienating the alternate residential parent's ability to enjoy a parenting relationship with his children that this Court has ever seen." The court also found that adopting the Father's proposed parenting plan was in the best interest of the children.

As part of its order, the court approved a new permanent parenting plan, which modified the Joint Custody Plan. The new parenting plan named Father primary residential parent of Micaiah and Ava and granted Mother 80 days of visitation each year. The new parenting plan also directed Mother to pay Father $886 per month in child support.

Mother appeals the decision to modify the primary residential parent. She "does not challenge the Trial Courts [sic] ruling that an unanticipated material change in circumstances ha[d] occurred." Instead, Mother argues that the court misapplied the best interest factors and that changing the primary residential parent was not in the children's best interest.

## II. ANALYSIS

Adjudicating disputes over who should be designated the primary residential parent is one of a court's greatest responsibilities. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). A court's designation of the primary residential parent as part of a final decree of divorce is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). However, because circumstances change in unanticipated ways, courts are statutorily empowered to modify a primary residential parent designation. *See* Tenn. Code Ann. § 36-6-101(a)(1) (2014) (A decree naming a primary residential parent for a minor child "shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require.").

Courts apply a two-step analysis to requests to change the primary residential parent designation. *Keisling v. Keisling*, 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005). The threshold issue is whether a material change in circumstance has occurred since the court's

prior order. *Id.*; *see* Tenn. Code Ann. § 36-6-101(a)(2)(B) (2014); *Armbrister v. Armbrister*, 414 S.W.3d 685, 697-98 (Tenn. 2013). Only if a material change in circumstance has occurred do we consider whether a modification is in the child's best interest. *Armbrister*, 414 S.W.3d at 705.

In this appeal, Mother requests we focus on the trial court's best interest determination. The determination of where the best interests of the child lie is a factual question. *Id.* at 692; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). We review the trial court's factual findings de novo upon the record, with a presumption of correctness, unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d). Evidence preponderates against a trial court's factual finding when the evidence supports another factual finding with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005).

A material change in circumstance only permits the court to reexamine the parenting plan or, in this case, the joint custody plan in light of the child's best interest. *In re T.C.D.*, 261 S.W.3d at 746. The best interest analysis is a "particularly fact-intensive process." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003). Under the analysis, the trial court must determine which parent is "comparatively more fit than the other to be the custodial parent." *Id.* However, "the paramount consideration is the best interest of the child." *Culbertson v. Culbertson*, 393 S.W.3d 678, 685 (Tenn. Ct. App. 2012). To aid in the consideration of the child's best interest, the Legislature directs that courts look to a non-exclusive list of statutory factors found at Tennessee Code Annotated § 36-6-106(a)(1)-(15). Tenn. Code Ann. §§ 36-6-404(b), -405(a) (2014).

Mother argues the trial court did not correctly apply the best interest factors in deciding this case. She claims the trial court did not place enough weight on the strength and stability of her relationship with her children. *See id.* § 36-6-106(a)(1) (2014). The trial court weighed this factor in favor of Mother, as she had been the primary caregiver for the children. On the other hand, the trial court also found that the relationship between Father and the children had been impeded and harmed by Mother.

Mother submits the evidence preponderates against the finding that she impeded or harmed Father's relationship with his children. According to Mother, the proof showed that Father did not have much interest in parenting the children for two and a half years. She also notes that the court specifically found that Father was "meek and reticent" in asserting his rights through 2013.

We find Mother's argument unavailing. The court qualified its finding of meekness and reticence on the part of Father by noting that his attitude was due in part to Mother placing the children with their grandmother during Mother's deployment. The court added

9

that Father did not attempt to take the children because he did not want to disrupt their schooling, things were going well, and grandmother allowed open communication with the children. We find the evidence does not preponderate against the trial court's findings with respect to this factor.

Next, Mother argues that the factor concerning each parent's willingness "to facilitate and encourage a close and continuing parent-child relationship" should be weighed in favor of both Mother and Father. *See id.* § 36-6-106(a)(2) (2014). She claims that the trial court erred in placing weight on the fact that Mother's spouse acted as a caregiver. Although Mother acknowledges that her spouse communicated with Father in an inappropriate manner, Mother submits she addressed her spouse's actions and that such behavior will cease.

Mother's argument ignores her own role in hindering a close and continuing relationship between Father and the children. We find the record amply supports the court's findings that "Mother failed to foster a good relationship" and "appears to be incapable of fostering a good relationship between [Father and] the children." The evidence also does not preponderate against the court's finding that Mother's spouse contributed to these issues. Father's evidence of his communications with Mother's spouse was unchallenged, and these communications suggest that Mother's spouse at least played a part in discouraging a close and continuing relationship between Father and the children.

Mother argues that the court misapplied the factor concerning the "love, affection, and emotional ties existing between each parent." *See id.* § 36-6-106(a)(6) (2014). Although the court found the factor weighed in favor of both parties, the court stated it considered in its determination "the conduct of Mother in alienating the children from the Father and falsely telling the younger two children that the Father [wa]s not their father." Mother claims this was improper and that the factor should be weighed in her favor. We disagree. We conclude it was appropriate to consider how Mother might have tilted this factor in her favor by her actions.

The court did not find the "emotional needs and development level" of the children weighed in favor of one parent over the other. *See id.* § 36-6-106(a)(7) (2014). However, Mother faults the court for not considering the time, energy, and effort Mother spent to care for a child with autism. We fail to see how a consideration of Mother's effort would have led to a finding that the factor favored Mother over Father. Father demonstrated that he had access to the same care that Micaiah was currently receiving and a willingness to follow through with such care if he were named Micaiah's primary residential parent.

The court weighed the "moral, physical, mental and emotional fitness of each parent" in favor of Father. *See id.* § 36-6-106(a)(8) (2014). Mother argues that this factor should have been weighed in favor of both parties. We agree with the trial court that Mother's conduct in dealing with Father tips this factor in favor of Father.

10

Finally, Mother argues that the court did not give enough weight to the "importance of continuity" in the children's lives and the length of time the children had "lived in a stable, satisfactory environment." *See id.* § 36-6-106(a)(10) (2014). The court did not make a specific finding that this factor weighed in favor of one parent over the other. The court did find that the children had lived primarily with Mother but "that the conduct of the Mother ha[d] resulted and will continue to result in harm to the children due to the Mother's inability to foster a good relationship between the children and their Father." These findings are supported by the record in this case. Further, we conclude, as apparently did the trial court, that any benefit of continuity was outweighed by the negative influence of Mother on the children. Additionally, the court determined that continuity would be disrupted regardless of the outcome of the case due to Mother's reassignment to Hawaii, which Mother testified would be for at least four years.

### III. CONCLUSION

After reviewing the record, we find that the evidence does not preponderate against the trial court's factual findings. Father proved both a material change in circumstance and that a change in primary residential parent is in the best interest of the two youngest children. Therefore, we affirm the judgment of the trial court.

_____
W. NEAL MCBRAYER, JUDGE

11